IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

STEPHEN O. and BRIDGET M.,
individually and on behalf of J.O.,

                Plaintiffs,

      v.

SCHOOL DISTRICT OF PHILADELPHIA,

             Defendant.

CIVIL ACTION
NO. 20-1991

## OPINION

Slomsky, J.                                                     December 29, 2021

### TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................1

II.    BACKGROUND ..................................................................................................1

    A.    **Statutory Background** .........................................................................1

        1.    IDEA ..........................................................................................2

            a.    The IEP ..........................................................................3

            b.    Exhaustion of Administrative Remedies .......................3

            c.    Settlement Agreements and the IDEA ...........................4

            d.    Remedies ........................................................................5

        2.    Section 504 of the Rehabilitation Act. .......................................5

        3.    Americans with Disabilities Act .................................................6

        4.    Remedies under Section 504 and the ADA .................................6

**B.**     **Factual Background** ......................................................................7

    1.     Settlement Agreement ..........................................................8

    2.     Interim IEP and Beginning of First Grade Year .......................10

    3.     Formulating an IEP for J.O. ...............................................12

    4.     Extended School Year Services ...........................................14

    5.     Final Status of J.O.'s IEP and Enrollment at Orchard Friends ...15

**C.**     **Procedural Background** ...............................................................15

**D.**     **The Case Before this Court** .........................................................16

**III.**     **STANDARD OF REVIEW** ............................................................17

**IV.**     **ANALYSIS** ................................................................................19

**A.**     **The Modified <u>De Novo</u> Standard of Review Applies to Plaintiffs'
Section 504 and ADA Claims and No Trial Is Required** ..................20

    1.     The Modified <u>De Novo</u> Standard ........................................20

    2.     No Trial Required for Section 504 and ADA Claims ................23

**B.**     **The Hearing Officer Correctly Found the Settlement Agreement
Controlled the District's Obligations to Plaintiffs from
August 9, 2018 to December 3, 2018** ............................................27

    1.     Hearing Officer's Consideration of Settlement .......................27

    2.     FAPE Was Not Denied from August 9, 2018 to
December 3, 2018 ............................................................32

**C.**     **The Hearing Officer Correctly Found J.O Was Provided
with a FAPE from December 3, 2018 to March 22, 2019** ................34

**D.**     **The Hearing Officer Correctly Found J.O. Was Provided
with a FAPE from March 22, 2019 to May 7, 2019** .........................39

**E.**     **Section 504 and ADA Claims** ......................................................44

**F.**    **Summary Judgment as to Counts I and II of the Complaint** ..........................45

    1.    Compensatory Education ........................................................................46

    2.    Tuition Reimbursement...........................................................................47

**G.**    **ESY Reimbursement**.......................................................................................48

**V.**    **CONCLUSION** ........................................................................................................50

## I.      INTRODUCTION

This case involves the appeal of an administrative hearing decision that came about because parents were dissatisfied with the public education provided to their disabled child.  The subject of this case, J.O.,[1] is a child with several disabilities that adversely impact his ability to learn.  On April 22, 2020, J.O., along with his Parents (collectively, "Plaintiffs"), brought suit against the School District of Philadelphia ("Defendant"), appealing a decision in part made by Brian Jason Ford, a Pennsylvania Special Education Hearing Officer, who presided over a due process hearing. In appealing the decision, Plaintiffs allege that Defendant failed to provide J.O. with a free appropriate public education ("FAPE"), in violation of the Individuals with Disabilities Education Act ("IDEA"), Section 504 of the Rehabilitation Act of 1973 ("Section 504"), and Title II of the Americans with Disabilities Act ("ADA").  On September 17, 2020, the 6,230-page administrative record was filed under seal with this Court.

Before the Court are cross-motions for summary judgment on the administrative record filed by Plaintiffs and Defendant.  (Doc. Nos. 41, 42.)  Having carefully considered the parties' briefing and the voluminous administrative record, the Court will affirm the Hearing Officer's decision.   For reasons that follow, Plaintiffs' Motion for Summary Judgment [on the Administrative Record] (Doc. No. 41) will be denied and Defendant's Motion for Summary Judgment on the Administrative Record (Doc. No. 42) will be granted in part and denied in part.

## I.      BACKGROUND

### A.      Statutory Background

Before proceeding, it is important to review the statutes relevant to this case and to define the various legal terms used throughout this Opinion.

---

[1]      For confidentiality purposes, the Court refers to the minor student by his initials, J.O.

1.     **IDEA**

The first statute pertinent to Plaintiffs' claims is the Individuals with Disabilities Education Act ("IDEA").  The IDEA's purpose is to require states to "make available a free and appropriate public education to all children with disabilities residing within [the state's] borders."  D.S. v. Bayonne Bd. Of Educ., 602 F.3d 553, 556 (3d Cir. 2010).  This requirement is enforced through contingent federal funding to State Educational Agencies ("SEAs") and Local Educational Agencies ("LEAs"), where eligibility for funding is conditioned upon submission of a plan demonstrating that the state complies with the IDEA.  See 20 U.S.C. §§ 1412, 1413.  Thus, the IDEA strikes a bargain where, in return for federal government funds to educate students with disabilities, a state must comply with the IDEA.  Here, it is undisputed that Defendant School District of Philadelphia is an LEA receiving federal funding and that it is bound to comply with the IDEA.

The central promise of the IDEA is to provide a free and appropriate public education—a FAPE, for short—to every eligible disabled student.  What constitutes a FAPE, however, depends upon the needs of each child.  The statutory definition of a FAPE includes "special education," or a specifically designed instruction to meet the child's unique needs, and "related services," or support services required to help the child benefit from such instruction.  See Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1, 137 S. Ct. 988, 994 (2017) (citing §§ 1401(26), (29)).  To implement these statutory requirements, a state must provide each child with an individualized education program—or IEP—which is "the means by which special education and related services are tailored to the unique needs of a particular child."  Id. (internal quotation marks omitted); see also §§ 1412(a)(4), 1414(d).

### a.   The IEP

In sum, the IEP is "the centerpiece of the [IDEA]'s education delivery system for disabled children," and it must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." See Endrew F., 137 S. Ct. at 996 (internal citations omitted). The IEP must provide the student with a "basic floor of opportunity," but need not rise to the level of providing the student with "the optimal level of services" or grant all of the parents' requests. D.S., 602 F.3d at 557. Each IEP is required to include: (1) present levels of academic achievement and functional performance; (2) a statement of measurable annual goals; (3) how the child's progress toward meeting the annual goals is to be measured; and (4) special education and supplementary aids and services, as well as other details regarding how the IEP will be implemented. See § 1414(d)(1)(A)(i); see also N.H. by & Through S.H. v. Phoenixville Area Sch. Dist., No. CV 21-1066, 2021 WL 5998445, at *1 (E.D. Pa. Dec. 20, 2021).

An LEA, such as Defendant, is tasked with developing the IEP. This process typically involves the child's parents and school personnel working together to identify the child's needs and to develop a plan to achieve educational goals. As noted by the Supreme Court, "parents play[] 'a significant role' in this process." Winkelman ex rel. Winkelman v. Parma City Sch. Dist., 550 U.S. 516, 524 (2007). A child's IEP "should evolve with the child's development, and should be continually revised as appropriate." Charlene R. v. Solomon Charter Sch., 63 F. Supp. 3d 510, 513 (E.D. Pa. 2014) (citing § 1414(d)(4)). Thus, assessing the content and implementation of a child's IEP is crucial to the determination of whether a child was provided—or denied—a FAPE.

### b.   Exhaustion of Administrative Remedies

For a district court to have subject matter jurisdiction over a claim pursuant to the IDEA, a claimant must first exhaust the administrative remedies available under the statute. See Batchelor v. Rose Tree Media Sch. Dist., 759 F.3d 266, 272 (3d Cir. 2014) (citing Komninos by Komninos

v. Upper Saddle River Bd. of Educ., 13 F.3d 775, 778 (3d Cir. 1994)).  This requirement "encourage[es] parents and the local school district to work together to formulate an IEP for a child's education."  Batchelor, 759 F.3d at 275.  Administrative remedies under the statute involve filing a complaint with the child's LEA, and corresponding SEA, and participating in a due process hearing.  Id. at 272; see also §§ 1415(a), (b)(6)(A), (f)(1)(A).  "Upon receipt of a proper due process complaint, the SEA assigns the matter to a special education hearing officer who schedules a due process hearing."  T.L. by & through Latisha G. v. Pennsylvania Leadership Charter Sch., 224 F. Supp. 3d 421, 425 (E.D. Pa. 2016).  At the close of the due process hearing, the hearing officer will enter a decision.  If either the child's parents or the LEA are dissatisfied with the decision, they "have the right to bring a civil action with respect to the [due process] complaint . . . in a State court of competent jurisdiction or in a district court of the United States," as Plaintiffs have done in this case.  See id. at 425.

### c.      Settlement Agreements and the IDEA

Additionally, many disputes involving the IDEA are resolved with settlement agreements. Parties may finalize these agreements after mediation, and they are "enforceable in any State court of competent jurisdiction, or in a district court of the United States."  § 1415(f)(1)(B)(iii).  In IDEA cases, settlement agreements are "encouraged as a matter of public policy because they promote amicable resolution of disputes and lighten the increasing load of litigation faced by courts."  D.R. by M.R. v. E. Brunswick Bd. of Educ., 109 F.3d 896, 901 (3d Cir. 1997).  The Third Circuit Court of Appeals has held that a settlement agreement is a binding contract.  Courts apply contract law principles when interpreting settlement agreements negotiated as part of the IDEA administrative process.  See generally id.  Because some settlement agreements contain reservation of rights clauses or because parties dispute which claims were waived in the agreement, litigation may ensue, even in cases with IDEA settlement agreements.

4

### d.       Remedies

Among the remedies available under the IDEA are compensatory education and tuition reimbursement.  Compensatory education is an equitable remedy in which a child is given additional education hours to make up for deficient hours of schooling when not provided a FAPE.  See Ferren C. v. School Dis. Of Philadelphia, 612 F.3d 712, 717 (3d Cir. 2010).  "A court award of compensatory education requires a school district to provide education past a child's twenty-first birthday to make up for any earlier deprivation."  M.C. on Behalf of J.C. v. Cent. Reg'l Sch. Dist., 81 F.3d 389, 395 (3d Cir. 1996).

In contrast, tuition reimbursement is an appropriate remedy when parents decide to place their child in a private school due to the denial of a FAPE at the public school.  Forest Grove Sch. Dist. v. T. A., 557 U.S. 230, 247 (2009).  It is unclear whether tuition reimbursement is considered an equitable remedy in the Third Circuit.  Compare T.F. v. Fox Chapel Area Sch. Dist., 589 F. App'x 594, 599 (3d Cir. 2014) (holding tuition reimbursement is form of compensatory damages) with Lauren G. ex rel. Scott G. v. W. Chester Area Sch. Dist., 906 F. Supp. 2d 375, 391 (E.D. Pa. 2012) (referring to tuition reimbursement at equitable remedy).

### 2.       Section 504 of the Rehabilitation Act

The Rehabilitation Act ("RA") prohibits discrimination on the basis of disability in programs receiving federal funding, including schools.  Section 504 of the RA provides:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency[.]

29 U.S.C. § 794(a).  Further, § 504 has its own FAPE requirement.  Consistent with its obligations under Section 504, a school "must reasonably accommodate the needs of the handicapped child so as to ensure meaningful participation in educational activities and meaningful access to

educational benefits." <u>Ridley Sch. Dist. v. M.R.</u>, 680 F.3d 260, 280 (3d Cir. 2012) (citing <u>J.D. v. Pawlet Sch. Dist.</u>, 224 F.3d 60, 70 (2d Cir. 2000)).  Parents may bring a claim pursuant to Section 504 under the same facts asserted in an IDEA claim, and they may bring both claims concurrently, as Plaintiffs have done here.  In accordance with these similarities, in most circumstances, establishing the denial of a FAPE suffices to establish a § 504 claim.  <u>M.D. v. Colonial Sch. Dist.</u>, No. CV 20-2354, 2021 WL 1924083, at *12 (E.D. Pa. May 13, 2021).

### 3.      Americans with Disabilities Act

The Americans with Disabilities Act ("ADA") also provides a remedy for disabled students and their parents regarding a child's public education.  The ADA "extends the nondiscrimination rule of Section 504 of the Rehabilitation Act to services provided by any public entity without regard to whether the entity is a recipient of federal funds."  <u>Jeremy H. by Hunter v. Mount Lebanon Sch. Dist.</u>, 95 F.3d 272, 279 (3d Cir. 1996) (internal quotation marks and parentheses omitted).  This extension to a "public entity" applies regardless of whether the entity receives federal funding.  For claims under § 504 and the ADA that may be brought under the IDEA—even where the claimants do not concurrently bring an IDEA claim—parents must still exhaust administrative remedies available under the IDEA.  Congress requires Section 504 and ADA claimants to go through the IDEA administrative process when the "parties could have asserted the claims under the IDEA."  <u>See</u> 20 U.S.C. § 1415(l); <u>Batchelor</u>, 759 F.3d at 273.

### 4.      Remedies under Section 504 and the ADA

Section 504, the ADA, and the IDEA use the same standard for determining whether a plaintiff is entitled to compensatory education.  <u>See, e.g.</u>, <u>Neena S. v. Sch. Dist. of Phila.</u>, 2008 U.S. Dist. LEXIS 102841, at *44–47 (E.D. Pa. Dec. 19, 2008). However, for tuition reimbursement, it is unclear whether parents must additionally prove intentional discrimination to

receive tuition reimbursement under Section 504 and the ADA.  Compare Lauren G., 906 F. Supp. 2d at 390–91 with Sch. Dist. of Phila. v. Kirsch, 722 F. App'x 215, 228 (3d Cir. 2018) (not precedential) (holding parents must prove "deliberate indifference" to obtain tuition reimbursement under Section 504 and the ADA).

### B.    Factual Background[2]

In this case, J.O. is a child with multiple disabilities: autism, anxiety, blindness in one eye, dyslexia, speech and language disorder, and Attention Deficit Hyperactivity Disorder ("ADHD"). (See Doc. No. 1 ¶¶ 11–12.)  Plaintiffs Stephen O. and Bridget M. are J.O.'s parents ("Parents"). (See id. ¶ 2.)  Because of the disabilities, J.O. has deficits in reading, writing, math, sensory management, social skills, and behavior.  (See id. ¶ 12.)   Between the fall of 2017 and approximately May 7, 2019, J.O. was a student at Vare-Washington Elementary School, which is within the School District of Philadelphia (the "District").  (Admin. Record, No. 13, Ex. 13 at 43:3–6.) During J.O.'s kindergarten year in 2017, he was placed in a self-contained autistic support classroom. (Admin Record, No. 13, Ex. 9 at 1092:6–11.) After J.O.'s kindergarten year, Plaintiffs were not satisfied with the education provided at Vare-Washington.  See infra.  As a result, Plaintiffs entered into a Settlement Agreement with the District prior to J.O.'s first grade year.  The Settlement set specific goals for evaluating J.O.  The Parents and school personnel decided that J.O. would be placed in a general education classroom and would receive assistance from a one-on-one aide.  These terms were included in the Settlement Agreement and ensuing IEPs.

The 2018–2019 school year at Vare-Washington, or J.O.'s first grade year, is the subject of this case.  In the spring of 2019, despite several revisions to J.O.'s IEP and his transfer to another

---

[2]    After review of the 6,320-page administrative record in this case, the Court has made no findings of fact that are contrary to the findings of fact in the decision of Pennsylvania Special Education Hearing Officer Brian Jason Ford.  See S.H., 336 F.3d at 270.

regular education classroom at the school, Plaintiffs remained dissatisfied with J.O.'s education. As a result, J.O.'s Parents made a decision to enroll him in a private school, Orchard Friends.  Here, the Parents seek from the District compensatory education for J.O.'s first grade year and tuition reimbursement for his schooling at Orchard Friends, as well as attorney's fees.  J.O.'s status as disabled, his qualification to participate in school activities, the School District of Philadelphia's status as an LEA, and the applicability of the IDEA, Section 504, and the ADA to J.O. are not in dispute.

### 1.    Settlement Agreement

As noted, J.O.'s first grade year at Vare-Washington is the period of schooling relevant to this case.  On August 9, 2018, prior to J.O.'s first grade year, Plaintiffs entered into the Settlement Agreement with the District regarding an earlier cause of action under the IDEA.[3]  (Doc. No. 3-1 at 3.)  Under the terms of the Settlement Agreement, Plaintiffs released all claims against the District prior to August 9, 2018.  (Id.)  In return, the District agreed to provide Plaintiffs with compensatory education, to fund and ensure the completion of three independent educational evaluations (IEEs) for J.O., and to propose an interim IEP for J.O.  (Id. at 4–5.)  J.O would be educated pursuant to the interim IEP until the District could complete a final IEP[4] based on the results of the IEEs.  (Id. at 5.)  The Agreement provided:

---

[3]   The earlier cause of action involved J.O.'s schooling during his kindergarten year.  Similar to this case, the action was brought by the parents pursuant to a due process complaint, filed on July 12, 2018, alleging the denial of a FAPE.  (See Admin. Record, No. 13, Ex. 3 at 46.)  It is undisputed that the period of schooling before the Settlement Agreement, or J.O.'s kindergarten year, is not relevant to the case at hand, as Plaintiffs waived all claims against the school district prior to August 9, 2018.  (See Doc. No. 13-40 at 37.)

[4]   As did the Hearing Officer, the Court "use[s] the term 'final IEP' colloquially, and to distinguish final IEPs from interim IEPs.  IEPs are often described as 'living documents' because they can be re-opened and revised as a child's needs change, even before the expected term of the IEP ends."  (Doc. No. 3-1 at 24 n.12.)

Within (15) days of execution and provision of this release by parents to District, District will provide to parents a proposed interim IEP for review and consideration. It is the intent of the parties that the interim IEP will be implemented pending production and review of the IEEs referenced herein. The parties have agreed that the interim IEP shall reflect deletion of a goal pertaining to "manners;" it shall include specific fine motor based goals related to handwriting production and fluency; and support to school personnel in the area of behavior modification (e.g. behavior plans; date tools and collection; reinforcers and schedules) with consultancy and/or training to be provided by BCBA;[5] Autistic Support Coordinator; Registered Behavior Technician, Training and/or consultancy shall be reflected in a specific number of minutes per IEP term.

(Doc. No. 13-40 at 42.) The Settlement Agreement also specified the types of IEEs J.O. would receive to assess his progress and determine his final IEP: (1) Speech and Language; (2) Occupational Therapy (OT), including handwriting; and (3) a Functional Behavioral Assessment (FBA), including a VB-MAPP.[6] (Id. at 5.) The Settlement also provided:

In addition to, and separate from the 360 hours specified herein, District has agreed to fund three (3) independent educational evaluations ("IEES") in the following areas:
    a.    Speech and language;
    b.    Occupational therapy (to include handwriting);
    c.    Functional behavioral assessment and VB MAPP.

All three evaluations are to be performed by appropriately credentialed individuals. No evaluation may be performed by any individual who has/is providing service to the student or by individuals employed by, or affiliated with, any company/organization that has or is providing service to the student.

(Doc. No. 13-40 at 41.) The Agreement further provided:

It is the intent of the parents and District that upon commencement of the 2018-19 [School Year], through the interim IEP, the student shall be in the 1st grade setting with the support of a (1-1) assigned by the District across all settings. The (1-1) will be trained by a District BCBA prior to working with the student and will receive on-going support as referenced in (G). Removals from the regular

---

[5]    BCBA is an acronym for a Board Certified Behavior Analyst. (See Doc. No. 3-1 at 5.)

[6]    "The VB-MAPP is an assessment tool that measures the school readiness of young children." (Doc. No. 3-1 at 5 n.2.)

education setting are acknowledged for the purpose of social skills; individual speech therapy as needed.

(Id. at 42.)  Thus, the parties agreed that J.O. would be placed in the first-grade regular education setting, as opposed to his prior autism-only classroom, with a one-to-one aide that would be trained by a District BCBA.

As noted previously, under the terms of the Settlement, Plaintiffs released all claims against Defendant prior to August 9, 2018.  (Doc. No. 13-40 at 37.)  However, the Settlement Agreement included a reservation of rights clause for the benefit of Plaintiffs.[7]  (Id. at 38.)  Here, Plaintiffs contend that the reservation of rights clause was not violated by the filing of this case because it covers events occurring after the Settlement Agreement was executed.  (See Doc. No. 1 at 7.) Finally, the Settlement Agreement reads:

> **NO ACKNOWLEDGEMENT:** Nothing in this Agreement shall constitute nor be construed as an acknowledgement by the District that any of the educational programs, services, materials or equipment for which payment or reimbursement is made pursuant to the terms of this Agreement constitute part of a free appropriate public education for the student . . . .

(Doc. No. 13-40 at 43.)

### 2.     Interim IEP and Beginning of First Grade Year

Prior to and during the first part of J.O.'s school year, his interim IEP went through a series of revisions after the Parents and the District's IEP team conferred about J.O.'s progress.  The series of revisions began in August 2018.  On August 16, 2018, one week after entering into the

---

[7]     The reservation of rights stated:

> **RESERVATION OF RIGHTS:**  Nothing in this Agreement shall be construed as a release by Parents of any claims that may arise after the date of this Agreement regarding events that occur after the date Parents sign the Agreement.

(Doc. No. 3-1 at 38.)

Settlement Agreement, Defendant proposed an interim IEP for J.O. pursuant to the Settlement and issued a Notice of Recommended Educational Placement ("NOREP").  Parents can approve or reject proposed IEPs in the NOREP.  (Doc. No. 3-1 at 6.)  Plaintiffs responded to the NOREP by writing revisions that were promptly incorporated into a revised interim IEP by the District on August 31, 2018.  (Admin. Record, No. 13, Ex. 14, S-4; Ex. 12 at 164–68; Ex. 9 at 953–55; Ex. 14, S-4, Ex. 14, S-7 at 276–78, 294–307.)  Yet, J.O.'s parents were still unhappy with the interim IEP and did not approve of it.  (Doc. No. 3-1 at 6.)  Convening again to address their concerns, Plaintiffs and the District's IEP team concluded that J.O.'s behavior during school "impeded the Student's learning or that of others."  (Id.)  However, because the IEEs to assess J.O. were not concluded at that time, the parties agreed that "the District should not conduct its own FBA," or Functional Behavioral Assessment, because J.O. was to receive an independent FBA.[8]  (Id.)  After this meeting, another interim IEP was issued on September 18, 2018, which was approved by Plaintiffs.  (Admin. Record, No. 13, Ex. 2 at 5, ¶ 14; Ex. 14, S-7 at 49–51.)

In the meantime, on August 27, 2018, J.O. began his first-grade year at Vare-Washington in Meredith Buse's general education class, where he was supported by his one-on-one aide, Brianna Lomax, and special education teacher, Christine Ryan.  (Admin. Record, No. 13, Ex. 10 at 633:11–35:23; Ex. 13 at 227–28; Ex. 12 at 50:20–51:14; 635:3–37:21.)  While both worked on the goals in the interim IEP with J.O., Ms. Lomax worked "at the discretion of Ms. Ryan," as testified to by Ms. Buse.  (Admin. Record, No. 13, Ex. 10 at 606.)  Additionally, J.O.'s IEP team began working with Board Certified Behavior Analysts ("BCBAs") Jamie Devlin and Jennifer

---

[8]  Despite the agreement that J.O. was to receive an independent FBA, the District additionally planned to "collect behavioral data and [] use existing information to draft a Positive Behavior Support Plan (PBSP) for the Parents' review."  (Doc. No. 3-1 at 7.)  The PBSP was finalized, and Parents approved the PBSP via a NOREP on October 12, 2018.  (Id.)

Cronin.  The purpose of this collaboration was to observe J.O and make recommendations to his IEP team regarding their assessments.  (Admin. Record. No. 13, Ex. 14, S-73 at 38–39, Ex. 10 at 566–77, Ex. 16, S-60 at 2, S-73 at 274–83.)   Further, Plaintiffs' chosen evaluator for J.O.'s independent FBA, Jessica Dean, began to observe J.O. in Ms. Buse's classroom setting.  (Doc. No. 13 at 369–73.)  During this period, Parents and the District awaited the results of the IEEs.

### 3.    Formulating an IEP for J.O.

By the beginning of December 2018, the three independent educational evaluations ("IEEs") required by the Settlement Agreement were completed and the results were furnished to the District.  (Doc. No. 3-1 at 7.)  At this point, the IEP team could confer and implement changes to the IEP as necessary.  On December 4, 2018, the District set an IEP team meeting for January 3, 2019.[9]  (Id.)  The meeting took place as scheduled, and the team reviewed the IEEs to create a final IEP for J.O.  (Id.)  By then, the independent FBA was also completed.  (Id.)  At the meeting, the District responded to concerns in the FBA regarding Ms. Buse's classroom by arranging for Plaintiffs to observe another teacher's classroom at the school.  (Id. at 8.)  Due to issues with the

---

[9]    In the decision being appealed here, Hearing Officer Ford found that the time between meetings was reasonable:

> The record does not reveal why the District scheduled the IEP team meeting to convene a full month after it received the IEEs but, given the time of year and the considerable work that the District was required to do simply to prepare for the meeting, I find that it was reasonable for the District to convene the IEP team on January 3, 2019.

(Doc. No. 3-1 at 26.)

independent FBA,[10] the District proposed to conduct its own FBA[11] at the meeting and evaluated the VB-MAPP results, which supported J.O.'s continued placement in a general education setting. (Id.)  Because of the breadth of topics discussed at the January 3, 2019 meeting, the IEP team was unable to complete review of the IEEs and finish revising J.O.'s IEP.  (Id.)  The team therefore scheduled another meeting to complete these tasks.  (Id.)  In the meantime, after Parents' observation at the school, J.O. transferred on January 7, 2019 to another general education classroom taught by Jacqueline Turner.  (Id.)

The next IEP team meeting for J.O. took place on February 14, 2019.[12]  (Doc. No. 3-1 at 9.)  At the meeting, the team and Parents completed review of the IEEs, analyzed a reevaluation report drafted by the District, and made changes to the IEP.  (Id. at 9.)  Based on discussions at this meeting and after revisions in accordance with Plaintiffs' concerns, the District proposed an IEP in a NOREP on February 21, 2019.  (Id. at 10.)  And, to further address Parents' concerns, the District held a conference call with them to discuss additional revisions.  (Id.)  On March 8, 2019, the District issued a final IEP and NOREP, which Parents signed and approved on March 22,

---

[10]  The District expressed concerns with the independent FBA's recommendation that "a BCBA should conduct a complete Functional Behavioral Assessment including a functional analysis to have the best possible date regarding the function of [J.O.'s] challenging behaviors within the school setting." (Id. at 7–8.)  The District was under the impression that the independent FBA would be doing this analysis.  (See id. at 7–8.)

[11]  Parents consented on January 22, 2019 to the District's plan to do its own FBA.  (Id. at 8.)

[12]  This meeting was originally scheduled for January 31, 2019.  (Id. at 8–9.)  Parents brought a non-attorney advocate to the meeting with them, and because the District "would have brought different personnel to the meeting had it known," the meeting was rescheduled to February 11, 2019. (Id. at 9.)  Thereafter, the meeting was again postponed because Parents could not attend on that date.  (Id.)

2019.[13]  (Id. at 11.)  At this point, Parents consented to the District implementing the final IEP for

J.O.[14]  (Id.)

### 4.    Extended School Year Services

On March 8, 2019, along with the IEP and corresponding NOREP, the District sent Parents

another NOREP proposing Extended School Year ("ESY") services for J.O.  (Doc. No. 3-1 at 10.)

The NOREP recommended that J.O. attend "a two-week program at a private therapeutic center

that [J.O.] had previously attended, and a six-week autistic support program housed in a learning

support classroom during the summer of 2019."  (Id.)  After Parents requested a meeting to discuss

the ESY further, the District and Parents agreed to revise the ESY plan so that J.O. would attend a

private camp for disabled children, instead of the six-week autistic support program.  (Id. at 11.)

The District committed to funding J.O.'s time at camp and to providing forty (40) hours of

compensatory education for him at a therapeutic center over the summer.  (Id.)

This plan was recorded in a second ESY NOREP, which was issued to Parents on March

25, 2019.  (Id. at 12.)  Nevertheless, in response, Parents "both approved and rejected the District's

proposal."  (Id.)  They accepted the District's offer to fund the camp but rejected the offer for forty

(40) hours of compensatory education, instead seeking District funding for seven hours of service

---

[13]  Parents initially did not respond to the NOREP issued on March 8, 2019.  When the District
asked for an update, Parents responded that "they did not think the March 8, 2019 IEP and
NOREP were 'finalized' and asked the District to send finalized documents."  (Id. at 11.)
Although the District re-issued the IEP and NOREP on March 14, 2019, "[t]he March 8 and
March 14 IEP and NOREP are substantively identical."  (Id.)

[14]  Upon approving the IEP, Parents also wrote, "I am agreeing to sign this so that services will be
implemented for [Student].  But I am not agreeing that this is appropriate or sufficient to meet
[Student's] needs."  (Id.)

per week for 10 weeks at the therapeutic center.  (Id.)  During the summer of 2019, J.O. attended the private camp and was treated at the therapeutic center.  (Id. at 13.)

### 5.   Final Status of J.O.'s IEP and Enrollment at Orchard Friends

Despite the efforts detailed above, Parents remained dissatisfied with J.O.'s education at Vare-Washington.  One month after the District began implementing J.O.'s final IEP, Parents sent to the District on April 22, 2019 a "10-Day Notice" of withdrawal from the school by email.  (Doc. No. 3-1 at 12.)  The email included several assertions: (1) J.O. had not made progress during the 2018–2019 school year; (2) the District's IEPs were insufficient; (3) Parents anticipated disenrolling J.O. from Vare-Washington, enrolling him at a private school, and seeking tuition reimbursement from the District; and (4) regarding the ESY, Parents sought reimbursement for more time at the therapeutic center than offered by the District in the NOREP.  (Id.)  Three days later, on April 25, 2019, J.O.'s IEP team met with the Parents to discuss their email.  (Id.)  As a result, the District issued an updated IEP, which was "substantively similar" to the most recent IEP but "with updated information about [J.O.]'s progress and with a mastered goal removed."  (Id.) During the conference, the District also offered additional achievement testing, which the Parents verbally declined.[15]  (Id. at 12–13.)  On May 7, 2019, J.O.'s time at Vare-Washington came to an end when Parents enrolled J.O. at Orchard Friends, a private school.  (Id. at 13.)

### C.   Procedural Background

On May 13, 2019, Plaintiffs filed a special education Due Process complaint against Defendant School District of Philadelphia, alleging that Defendant "failed to provide J.O., a student with autism and other disabilities, with a free appropriate public education (FAPE)" at

---

[15]   Parents later agreed to the testing after the conference call; however, at that time, J.O. was attending Orchard Friends.  (Id. at 13 n.8.)  Although Parents brought J.O. to the District for testing, J.O. "would not comply with the testing."  (Id.)

Vare-Washington elementary school.  (Doc. No. 1 ¶¶ 2–3.)  Plaintiffs sought, <u>inter alia</u>, (1) compensatory education from August 27, 2018 to May 6, 2019,[16] (2) reimbursement for services J.O. received in the summer of 2019, and (3) reimbursement for J.O.'s private school tuition at Orchard Friends School plus transportation "beginning on May 7, 2019, or, in the alternative, a compensatory education fund . . . ."  (<u>Id.</u> ¶ 4.)

An eight-session Due Process Hearing commenced on July 24, 2019 and concluded on December 19, 2019.  (<u>See</u> Doc. No. 30 at 13.)  The parties introduced over 150 exhibits[17] and called 14 witnesses to testify during eight sessions.  (<u>See</u> Doc. No. 13 at 2–3, 266, 366, 435, 468, 577, 696, 815, 893.)  On January 31, 2020, Pennsylvania Special Education Hearing Officer Brian Jason Ford issued his decision after reviewing "the large record of th[e] case in its entirety."  (Doc. No. 3-1 at 4.)  In the decision, Ford found that "all witnesses testified credibly," and "[t]o the extent that any witness's opinion testimony conflicted with another's, those witnesses honestly reach different conclusions with the same facts."  (<u>Id.</u> at 14.)  The Hearing Officer found in favor of Defendant on all of Plaintiffs' claims pursuant to the IDEA, except for Plaintiffs' request for reimbursement of J.O.'s ESY services, which the Hearing Officer granted.  (<u>Id.</u> at 4, 36–37.)  Ultimately, the Hearing Officer held that the final IEPs offered by Defendant while J.O. attended Vare-Washington were "reasonably calculated to provide a FAPE" to J.O.  (<u>Id.</u> at 36.)

### D.    The Case Before this Court

On April 22, 2020, Plaintiffs initiated the action before this Court.  (<u>See</u> Doc. No. 1.)  Seeking "to appeal those portions of the Hearing Officer's decision that found against [them],"

---

[16]    This is the period when J.O. attended Vare-Washington.  It is after the date the Settlement Agreement was approved and before the date Plaintiffs placed him in Orchard Friends School.  (<u>See</u> Doc. No. 1 ¶ 33.)

[17]    By this Court's calculation, the parties introduced a total of 171 exhibits at the Due Process Hearing.

Plaintiffs filed suit under the IDEA, Section 504, and the ADA on the ground that "[t]he Hearing Officer's failure to award compensatory education was based on several errors of law." (Id. ¶¶ 1, 6, 47.) On September 17, 2020, the 6,230-page administrative record was filed under seal. (See Doc. No. 13.)

On January 27, 2021, Plaintiffs filed a Motion to Supplement the Administrative Record with additional evidence, such as a transcript of the deposition of J.O.'s aide, Brianna Lomax, a Board Certified Behavior Analyst ("BCBA") report, and the results of several additional evaluations. (See Doc. No. 30.) However, on March 31, 2021, the Court issued an Opinion denying the Motion. See Stephen O. v. Sch. Dist. of Philadelphia, No. CV 20-1991, 2021 WL 1210001, at *1 (E.D. Pa. Mar. 31, 2021). In the Opinion, the Court noted that the additional evidence was cumulative to information in the administrative record and therefore would not be useful to the Court's decision in the case. See id. at *14.

On April 23, 2021, the parties filed Cross-Motions for Summary Judgment on the Administrative Record. (Doc. Nos. 41, 42.) And on May 21, 2021, the parties filed Responses to the Cross-Motions. (Doc. Nos. 43, 44.) The Court heard oral argument on the Cross-Motions on June 11, 2021. The Cross-Motions are now ripe for decision.

## II.   STANDARD OF REVIEW

Under the IDEA, "[any] party aggrieved by the findings and decision" of the state administrative hearing examiner may bring suit in "any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy." 20 U.S.C. § 1415(i)(2)(A). In reviewing the complaint, a court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party;[18] and (iii)

---

[18]   In its Opinion denying Plaintiffs' Motion to Supplement the Administrative Record, the Court noted at length:

basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C).

The standard for federal review of a state hearing officer's decision is "modified <u>de novo</u>," which is a "nontraditional standard of review."  <u>D.S.</u>, 602 F.3d at 564 (citations omitted).  The United States Supreme Court has construed 20 U.S.C. § 1415(i)(2)(C) to require that district courts give "due weight" to the administrative proceedings, while being careful to avoid replacing its "own notion[] of sound educational policy for those of the school authorities [that] they review."

---

A district court reviewing a Due Process Hearing decision pursuant to the IDEA "shall hear additional evidence at the request of a party . . . ."  20 U.S.C. § 1415(i)(2)(C)(ii).  Under Third Circuit precedent, district courts have discretion to determine "what additional evidence to admit in an IDEA judicial review proceeding" and must "evaluate a party's proffered evidence before deciding to exclude it."  <u>Susan N. v. Wilson Sch. Dist.</u>, 70 F.3d 751, 759-60 (3d Cir. 1995).  When evaluating the proffered evidence, the central question is whether the evidence is "'relevant, non-cumulative and useful' in determining whether a child's program is in compliance with the IDEA."  <u>M.C. by & through Conyers v. Sch. Dist. of Philadelphia</u>, 393 F. Supp. 3d 412, 415 (E.D. Pa. 2019) (quoting <u>Susan N.</u>, 70 F.3d at 760); <u>see</u> <u>also</u> <u>L.G. ex rel. E.G. v. Fair Lawn Bd. of Educ.</u>, 486 F. App'x 967, 975 (3d Cir. 2012).

Courts "should not automatically disallow testimony from all who did, or could have, testified before the administrative hearing, but . . . need not consider evidence that is irrelevant or cumulative."  <u>D.K. v. Abington Sch. Dist.</u>, 696 F.3d 233, 253 (3d Cir. 2012) (citations and internal quotations omitted).  Factors courts consider when deciding whether to allow supplemental evidence are: "(1) whether a procedural bar prevented the introduction of the evidence at the administrative level; (2) whether the evidence was deliberately withheld for strategic reasons; (3) whether the introduction of the evidence at the district court level would be prejudicial to the other party; and (4) the potential impact on the administration of justice."  <u>Jaffess v. Council Rock Sch. Dist.</u>, No. 06-0143, 2006 WL 3097939, at *3 (E.D. Pa. Oct. 26, 2006) (citing <u>F.D. v. Holland Twp. Bd. of Educ.</u>, No. 05-5237, 2006 WL 2482574, at *3 (D.N.J. Aug. 25, 2006)).

<u>See</u> <u>Stephen O. v. Sch. Dist. of Philadelphia</u>, No. CV 20-1991, 2021 WL 1210001, at *5–6 (E.D. Pa. Mar. 31, 2021).  Based upon this standard, the Court determined that the additional evidence was cumulative to the administrative record and denied Plaintiffs' Motion to Supplement the Administrative Record (Doc. No. 30).

Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 206 (1982).  A hearing officer's findings of facts from the administrative proceedings "are to be considered prima facie correct."  Ridley Sch. Dist., 680 F.3d at 268 (citations omitted).

In turn, however, if a reviewing court chooses to stray from any of the facts found by the hearing officer, the court "is obligated to explain why."  S.H. v. State-Operated School District of the City of Newark, 336 F.3d 260, 270 (3d Cir. 2003) (quoting MM v. Sch. Dist. of Greenville Cnty., 303 F.3d 523, 531 (4th Cir.2002)).  Taking these standards into account, "a district court is authorized to make findings based on the preponderance of the evidence and grant the relief it deems appropriate."  D.S., 602 F.3d at 564; see also Shore Reg'l High Sch. Bd. of Educ. v. P.S., 381 F.3d 194, 199 (3d Cir. 2004) (describing a district court's burden as "unusual" in that it must make its own findings by a preponderance of the evidence, but nevertheless afford "due weight" to the administrative officer's determinations).

The parties dispute, however, the applicable standard of review for the Section 504 and ADA claims.  For reasons explained below, the Court will apply the modified de novo standard of review not only to Plaintiffs' claims under the IDEA, but also to their claims under Section 504 and the ADA.

## III.   ANALYSIS

First, the Court will address Plaintiffs' procedural arguments that the de novo standard of review applies to their Section 504 and ADA claims, and that they are entitled to a trial de novo on these claims, instead of disposition by summary judgment on the administrative record under the modified de novo standard.  Next, the Court will analyze Plaintiffs' objections to the Hearing Officer's decision, first regarding the Settlement Agreement, and second regarding Plaintiffs' substantive claims under the IDEA.  The Court will then assess Plaintiffs' claims under Section 504 and the ADA.  Incorporated into the analyses will be a discussion of whether J.O. is entitled

to compensatory education and his parents to tuition reimbursement and reimbursement for Extended School Year ("ESY") services.

A.    **The Modified <u>De Novo</u> Standard Applies to Plaintiffs' Section 504 and ADA Claims and No Trial is Required**

There are two procedural issues raised by Plaintiffs: (1) that the <u>de novo</u> standard of review, not the modified <u>de novo</u> standard, applies to Plaintiffs' claims under Section 504 and the ADA, and no due weight should be given to the Hearing Officer's findings of fact; and (2) Section 504 and the ADA create a right to a trial <u>de novo</u> in federal court.  (<u>See</u> Doc. No. 41-2 at 8–11.)  Upon careful review of the law on this issue and the statutory language of the IDEA, the Court will apply the modified <u>de novo</u> standard to the Section 504 and ADA claims.  Further, because the Section 504 and ADA claims were brought pursuant to the IDEA's administrative process, as is required under 20 U.S.C. § 1415(l), due weight must be given to the Hearing Officer's findings of fact under the modified <u>de novo</u> standard and a trial <u>de novo</u> is not warranted.

1.    **The Modified <u>De Novo</u> Standard**

While the Court is mindful that the Third Circuit has not directly addressed the issue of whether the modified <u>de novo</u> standard of review applies to Section 504 and ADA claims brought subsequent to the IDEA's administrative process, the language of the IDEA and current authority lead to the conclusion that the standard applies to all three of Plaintiffs' claims.  The IDEA states:

> [n]othing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990 [42 U.S.C. § 12101–12213], title V of the Rehabilitation Act of 1973 [29 U.S.C. § 791–794f], or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the [IDEA administrative process] shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

20 U.S.C. § 1415(l).  Importantly, this means that "[e]xhaustion of the IDEA's administrative process is also required in non-IDEA actions where the plaintiff seeks relief that can be obtained under the IDEA." Batchelor, 759 F.3d at 272.  In other words, this requirement applies to Section 504 and ADA claims in cases involving a disabled student who is eligible for relief under the IDEA, even where the claimant does not bring an IDEA claim.  As the Third Circuit noted, "[t]his provision bars plaintiffs from circumventing the IDEA's exhaustion requirement by taking claims that could have been brought under the IDEA and repackaging them as claims under some other statute—e.g., [S]ection 1983, [S]ection 504 of the Rehabilitation Act, or the ADA." Id. at 272–73 (citing Jeremy H. v. Mount Lebanon Sch. Dist., 95 F.3d 272, 281 (3d Cir.1996)).

Congress's requirement that Section 504 and ADA claims in these cases first must exhaust the IDEA administrative process leads to the conclusion that Congress intended for the same procedural protections to apply to all three claims.  Also, it follows that one procedural protection that applies to all three claims is the modified de novo standard, created by the Supreme Court in Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley, 458 U.S. 176 (1982).  In Rowley, the Supreme Court created the modified de novo standard for IDEA claims because "[t]he very importance which Congress has attached to compliance with certain procedures . . . would be frustrated if a court were permitted simply to set state decisions at nought." Id. at 206.  Taken together, Congress's requirement that claimants under Section 504 and the ADA first exhaust the IDEA administrative process and the Supreme Court's decision that a district court must afford deference to the findings of fact in a hearing officer's administrative decision lead to the conclusion that the modified de novo standard applies to Plaintiffs' Section 504 and ADA claims, where due weight must be given to the Hearing Officer's findings in a district court's analysis of the case under those statutes, as well.

Cases from the Third Circuit support this conclusion.  Regarding the modified de novo standard, the Third Circuit has held in a case involving claims under the IDEA and Section 504:

> In reviewing a dispute brought under the IDEA's administrative process, a district court gives "due weight" and deference to the findings in the administrative proceedings.  We have described this "due weight" standard as "modified de novo" review.

P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist., 585 F.3d 727, 734 (3d Cir. 2009) (internal citations omitted).  Although the decision did not speak explicitly to the standard of review for Section 504 claims, this claim itself is "a dispute brought under the IDEA's administrative process," as is required by the language of 20 U.S.C. § 1415(l).  Further, in a recent decision, Yulia S. v. Hatboro-Horsham School District, No. 2:21-cv-02011, 2021 WL 5298990, at *3 (E.D. Pa. Nov. 15, 2021), the court concluded that the IDEA's modified de novo standard applied to the plaintiff's additional Section 504 and ADA claims, explaining as follows:

> To hold otherwise would permit a trial court to ignore administrative findings about those claims, even after Congress required parties to present the claims to an administrative tribunal and after Congress required the parties to submit the record of administrative proceedings to the district court.  That outcome would diminish, if not eliminate, the value of the administrative process that Congress has created and would make no sense.  Of course, Congress is free to adopt statutes that make no sense.  But courts should not be quick to assume that Congress did so.  See U. S. v. Fontaine, 697 F. 3d 221, 228 (3d Cir. 2012) (courts should adopt interpretations that avoid absurd results).  Instead, the Court will give "due weight" to those underlying administrative proceedings to avoid "substitute[ing] its own notions of sound educational policy for those of local school authorities."  S. H. v. State-Operated Sch. Dist. of City of Newark, 336 F. 3d 260, 270 (3d Cir. 2003).

Id. at *3.  Other courts in this district have applied the modified de novo standard of review to all claims brought subsequent to the IDEA administrative process, such as claims under Section 504 and the ADA.  See, e.g., Montgomery Cty. Intermediate Unit No. 23 v. A.F. by & through D.F., No. 20-1134, 2020 WL 7240380, at *18 n.34 (E.D. Pa. Dec. 9, 2020) ("The Third Circuit has clearly stated that '[i]n reviewing a dispute brought under the IDEA's administrative process,' the

'due weight' standard of review applies.") (citing P.P., 585 F.3d at 734 (applying modified de novo

standard to IDEA and Section 504 claims)); G.D. ex rel. G.D. v. Wissahickon Sch. Dist., 832 F.

Supp. 2d 455, 461 (E.D. Pa. 2011) (applying "due weight" standard to all claims).

Based on the above analysis, the Court will apply the modified de novo standard of review

to Plaintiffs' Section 504 and ADA claims in this case.

### 2.   No Trial Required for Section 504 and ADA Claims

Stemming from the debate over the proper standard of review is Plaintiffs' argument that

Section 504 and the ADA create a right to a trial de novo in federal court, thus precluding

disposition by summary judgment on their claims under these statutes.  Because the Court will

apply the modified de novo standard to the Section 504 and ADA claims, giving due weight to the

Hearing Officer's findings of fact, trial de novo on these claims would be improper.  Nevertheless,

Plaintiffs' arguments regarding a right to trial will be addressed seriatim.

First, Plaintiffs contend that the right to a trial de novo for their Section 504 and ADA

claims is required under the IDEA.  To support this notion, Plaintiffs point to 20 U.S.C. § 1415(l)

of the IDEA, supra, which states in part:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures,
> and remedies available under the Constitution, the Americans with Disabilities Act
> of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting
> the rights of children with disabilities . . . .

§ 1415(l).  Using this section of the statute, Plaintiffs argue that neither the IDEA nor the modified

de novo standard limit their right to a trial de novo on their claims under Section 504 and the ADA.

(See Doc. No. 49 at 1–2.)

But after review of relevant authority, the Court disagrees.  First, the modified de novo

standard, which would preclude a trial de novo if applied to Plaintiffs' Section 504 and ADA

claims, does not come from the text of the IDEA.  Instead, it is a standard provided by the United

States Supreme Court in <u>Rowley</u>.  Therefore, the standard does not fall within the statute's demand

that "[n]othing in this title shall be construed" to impede upon Plaintiffs' rights under Section 504

and the ADA.  In <u>Yulia S.</u>, where the claimant pointed to § 1415(l) to make a similar argument, the

court noted:

> The statute provides, "Nothing in <u>this Chapter</u> shall be construed to restrict or limit
> the rights, procedures, and remedies available under the Constitution . . . " 20 U. S.
> C. § 1415(l) (emphasis added).  But the IDEA does not require the modified <u>de
> novo</u> standard of review.  It is a judge-made rule.  So a court's application of the
> modified <u>de novo</u> standard to claims under the ADA and [Section 504] does not run
> afoul of the text of Section 1415 because it does not impose a limit that arises in
> that statutory chapter.  It is true, of course, that the Supreme Court's decision in
> <u>Rowley</u> stems from the Court's understanding of Congress's intent in adopting the
> IDEA.  But while the Supreme Court fashioned the rule based on provisions in the
> IDEA, the rule does not come from the text of the IDEA, and Section 1415(l) does
> not bar its application.  <u>See</u> <u>Jama v. Immigration and Customs Enforcement</u>, 543
> U. S. 335, 342 (2005) (courts do not "lightly assume that Congress has omitted
> from its adopted text requirements that it nonetheless intends to apply").

<u>Yulia S.</u>, 2021 WL 5298990, at *3.  Thus, even if Section 504 and the ADA carry trial rights in

certain situations, § 1415(l) would not bar a court from applying the modified <u>de novo</u> standard, a

judge-made rule, to Section 504 and ADA claims brought subsequent to the IDEA's administrative

process, precluding trial.

Second, none of the decisions relied upon by Plaintiffs to assert that Section 504 and the

ADA have trial rights in this situation speak specifically to whether a trial <u>de novo</u> is required for

Section 504 and ADA claims brought subsequent to the IDEA's administrative process.  Plaintiffs

first rely on <u>NAACP v. Medical Center, Inc.</u>, 599 F.2d 1247 (3d Cir. 1979), and posit that it stands

for the notion that "Section 504 plaintiffs generally have a right to 'a trial on the merits' and 'an

opportunity to try their cause in federal court,' even following the conclusion of administrative

proceedings."  (Doc. No. 41-2 at 8.)  The decision in <u>Medical Center</u> is not determinative here for

several reasons.  First, the case does not involve students.  Rather, in <u>Medical Center</u>, claimants

were organizations and individuals representing minority and handicapped persons in relation to a claim that relocating a medical facility from an inner city to a suburban location was discriminatory under Title VI and Section 504.  See Medical Center, 599 F.2d at 1248.  Second, the holding in Medical Center was that the claimants had a private right of action "to seek declaratory and injunctive relief" under Section 504, relief that is in stark contrast to the monetary relief Plaintiffs seek here.  See id. at 1248.  Most importantly, however, Medical Center is not a case that involves the statutory scheme created by Congress in § 1415(l).   Although the decision addresses that a plaintiff may pursue a "judicial remedy through a private right of action" for a Section 504 claim in addition to administrative remedies, the case does not involve the IDEA administrative process specifically.  Therefore, it has no bearing on the procedural protections in place for this process, such as the modified de novo standard of review.

Similarly, Berardelli v. Allied Services Institute Rehabilitation Medicine, 900 F.3d 104 (3d Cir. 2018) and Bowers v. Nat'l Collegiate Athletic Ass'n, 475 F.3d 524 (3d Cir. 2007) are not relevant to the issue at hand.  Aside from failing to enumerate a right to trial for Section 504 and ADA claims, the cases do not concern students eligible for relief under the IDEA.  Instead, Berardelli involves a request for a reasonable accommodation under Section 504 and the ADA for a student's need to use a service animal, and Bowers involves Section 504 and ADA claims regarding a student's eligibility for college sports, subject matters that are vastly different from the facts of the case at hand.  And most importantly, neither Berardelli nor Bowers involve claims that were brought subsequent to any form of administrative process.  Instead, the claimants initially sought judicial relief on their claims and were not required to exhaust any administrative remedies, much less those required under 20 U.S.C. § 1415(l).

Due to these differences, the above cases are not persuasive precedent on the procedural protections in place for the IDEA administrative process, such as the modified de novo standard, which also applies to the ADA and Section 504 claims.  Neither do these cases provide support in the context of this case for the right to a trial on the latter claims.  The Court concedes that, in certain situations, claimants have a right to trial under Section 504 and the ADA.  However, they do not have a right to trial in situations where a student must exhaust administrative remedies under the IDEA prior to bringing claims under these statutes in court.  Congress's rule in § 1415(l) that Section 504 and ADA claimants must exhaust the IDEA's administrative process prior to filing a civil action would not make sense if a district court could at a trial so easily toss aside a hearing officer's findings of fact made after an administrative hearing.  This would shirk the deference given to a hearing officer's findings of fact as set forth in Rowley, which "should apply with equal force to claims under the ADA and [Section 504] when those claims went before a hearing officer." Yulia S., 2021 WL 5298990, at *3.  Accordingly, a trial de novo on these claims is not warranted based on the authority presented by Plaintiffs.

Moreover, to the extent that Plaintiffs desire to present the additional evidence at a trial on their Section 504 and ADA claims, the Court has already found that such evidence would be cumulative to the evidence already in the 6,320-page administrative record.  See Stephen O., No. CV 20-1991, 2021 WL 1210001, at *1 (holding additional evidence Plaintiffs sought to introduce was cumulative to the administrative record).  Therefore, because Plaintiffs' claim that they are entitled to a trial de novo on their Section 504 and ADA claims brought pursuant to the IDEA administrative process is without merit, the Court will deny Plaintiffs' request for a trial de novo on these claims and will evaluate their claims here under the modified de novo standard of review.

**B.      Hearing Officer Correctly Found the Settlement Agreement Controlled the District's Obligations to Plaintiffs from August 9, 2018 to December 3, 2018**

**1.      Hearing Officer's Consideration of Settlement**

The second matter disputed by the parties is whether the Hearing Officer erroneously interpreted the Settlement Agreement, executed on August 9, 2018.   In their Cross-Motion, Plaintiffs find issue with the Hearing Officer's treatment of their 2018 Settlement Agreement regarding certain time periods of J.O.'s schooling.   For the period of schooling from August 9, 2018 to December 3, 2018, the first part of J.O.'s first grade year, Plaintiffs state their concerns as follows:

> From the beginning of the 2018–19 school year through December 3, 2018, the Hearing Officer declined to "consider whether the original interim IEP or any of its revisions were reasonably calculated to provide a FAPE" on the ground that "[t]hose documents need only comply with the [2018] Settlement."

(Doc. No. 41-2 at 12.)

Primarily, Plaintiffs argue that "[t]he Hearing Officer committed legal error by misconstruing the parties' previous 2018 Settlement Agreement," as he "incorrectly found that 'much of the Student's 2018-19 school year was controlled by the [2018] Settlement.'"  (Doc. No. 1 ¶ 48.)  Focusing on this point, Plaintiffs assert that the Hearing Officer "failed to address whether the District's pre-December 2018 IEPs offered FAPE under the IDEA or otherwise offered J.O an appropriate education." (Doc. No. 1 ¶¶ 53–55, 56–60.)   Parents emphasize that, because they reserved their rights to assert claims under the IDEA for events subsequent to the Agreement, a decision that the Settlement controlled any part of J.O.'s first grade year would be erroneous.  (Doc. No. 41-2 at 15.)

In his decision, the Hearing Officer found that, from August 9, 2018 to December 3, 2018, or from the Settlement Agreement date until when the IEEs were completed and in the possession of the District, that:

> [I]t is clear within the four corners of the Settlement that the parties agreed to proceed under its terms, as opposed to what the IDEA requires. The concept of an interim IEP appears nowhere in the IDEA. Rather, the IDEA requires schools to have an appropriate IEP in place for children with disabilities at all times. In exchange for three IEEs and specific, agreed-to provisions within the interim IEP, the Parents agreed that the District could issue an interim document establishing what special education it would provide to the Student. As such, the interim IEP was part of the consideration in the Settlement, set the metes and bounds of the District's obligations to the Student at least until the IEEs were complete, and was something other than what the IDEA would otherwise require.

(Doc. No. 3-1 at 24.) The Hearing Officer continued:

> The District offered an interim IEP that complied with the requirements set forth in the Settlement. The Parents make no argument to the contrary. Between the start of the 2018-19 school year and December 3, 2018, the interim IEP was revised several times. None of those revisions brought the interim IEP out of compliance with the Settlement. Consequently, I will not consider whether the original interim IEP or any of its revisions were reasonably calculated to provide a FAPE on the day that they were issued. Those documents need only comply with the Settlement, and all of them do.

(Id.) Addressing Plaintiffs' arguments, he stated:

> The Parents claim that the District did not implement the interim IEP or any of its revisions with fidelity. The Settlement does not protect the District from a denial of FAPE arising from an IEP implementation failure. Such a failure is the type of contract breach that gives rise to a denial of FAPE claim in and of itself.
>
> In reaching this conclusion, I am sensitive to the Parents' argument that their consent to any IEP does not constitute a defense for the District. The substantive right to a FAPE is the child's right, not the parents' right. Consequently, when parents agree to an inappropriate IEP, the school still violates the child's right to a FAPE and the child is owed a remedy. Cases involving settlement agreements are different because the parties purposefully chose to set aside IDEA processes in favor of their own agreement. To my knowledge, no court has ever found that a parent cannot waive their child's IDEA rights through a settlement agreement. In this case, the Parents singed [sic] the Settlement on their own behalf and on behalf of the Student. Consequently, the District's obligations to the Student were controlled by the Settlement, not the IDEA, through December 3, 2018.

(Id. at 26.) (internal citation omitted).

In making the determinations above, Hearing Officer Ford found that "it is clear within the four corners of the Settlement that the parties agreed to proceed under its terms, as opposed to what the IDEA requires."  (Id. at 24.)  Yet, the Hearing Officer correctly found that if the school were to violate that Agreement, "the violation itself can be a denial of FAPE, and parents can seek a remedy for that violation through a due process hearing."  (Id. at 22.)

State contract law applies when a court interprets settlement agreements under the IDEA. See Lejeune v. Khepera Charter Sch., 327 F. Supp. 3d 785, 795 (E.D. Pa. 2018).  Under Pennsylvania law, a contract's meaning is interpreted according to the intent of the parties, looking to "the writing itself."  Lesko v. Frankford Hosp.-Bucks Cty., 609 Pa. 115, 123 (2011) (stating "[w]hen a written contract is clear and unequivocal, its meaning must be determined by its contents alone") (citations omitted).  Unlike the Court, a hearing officer does not have jurisdiction to enforce a settlement agreement; nevertheless, it is well established that a hearing officer has the authority to determine whether a valid contract exists in the administrative decision.  See I.K. ex rel. B.K. v. Sch. Dist. of Haverford Twp., 961 F. Supp. 2d 674, 682 (E.D. Pa. 2013), aff'd sub nom. I.K. ex rel. B.K. v. Haverford Sch. Dist., 567 F. App'x 135 (3d Cir. 2014).

Under Third Circuit law, a settlement agreement pursuant to the IDEA is valid and binding. In the context of the IDEA, when "a settlement agreement was voluntarily and willingly entered by the parties," it constitutes "a binding contract between the parties and should . . . be[] enforced as written."  D.R., 109 F.3d at 898.  To the extent that a settlement agreement accepts less than a FAPE under the IDEA, it is binding.  See generally Ballard ex rel. Ballard v. Philadelphia Sch. Dist., 273 F. App'x 184, 188 (3d Cir. 2008).  In Ballard, the Third Circuit held:

> A parent can waive her child's right to a FAPE.  The fact that [a claimant] entered into a settlement agreement, which she now contends falls short of providing her daughter with a FAPE, does not inherently violate law or public policy.  Parties routinely enter into agreements to resolve litigation. An agreement is not void because a party settled for less than s/he later believes the law provides.

Ballard ex rel. Ballard v. Philadelphia Sch. Dist., 273 F. App'x 184, 188 (3d Cir. 2008) (internal citations omitted).  The Third Circuit additionally explained that "[s]ettlement agreements are encouraged as a matter of law and public policy," and that "allowing parents to void settlement agreements when they become unpalatable would undercut that policy."  Id. at 186 (citing D.R., 109 F.3d at 901).

Despite a hearing officer not having jurisdiction to enforce settlement agreements, courts have determined that a hearing officer may refer to them in their decisions and consider them in deciding whether a child received a FAPE.  See, e.g., J.K. v. Council Rock Sch. Dist., 833 F. Supp. 2d 436, 449 (E.D. Pa. 2011).  In J.K., the court held:

> The IDEA's language and the purposes justifying due process hearings suggest that hearing officers lack jurisdiction to enforce settlement agreements—even those produced through mediation and resolution meetings—though, to be sure, they may acknowledge the existence of such agreements and consider them in determining whether a child has received a free and appropriate public education.

Id.

Here, the Hearing Officer correctly found that, from the beginning of J.O.'s first grade year until December 3, 2018, the Settlement Agreement controlled the District's obligations to Plaintiffs, rather than the IDEA.  From the writing in the Agreement, the clear intent of the parties is stated thus: "It is the intent of the parties that the interim IEP will be implemented pending production and review of the IEEs referenced herein."  (Doc. No. 13-40 at 42.)  In turn, the purpose of the IEEs was to evaluate J.O. to formulate a final IEP that provided J.O. with a FAPE.  It would follow, then, that the interim IEP "set the metes and bounds of the District's obligations" and

represented "something other than what the IDEA would otherwise require," as determined by the Hearing Officer.  (Doc. No. 3-1 at 24.)

If the parties had intended for the interim IEPs, issued immediately after the Settlement Agreement on August 16 and revised on August 31 and September 18, 2018, to be fully compliant with the IDEA, then it would have been superfluous to fund three additional IEEs to help formulate an IEP that was reasonably calculated to provide J.O. with a FAPE.  In fact, in Plaintiffs' Statement of Material Facts (Doc. No. 41-4), they state: "Parents agreed to give the District more time to develop a program 'for review and consideration' that would meet J.O.'s needs."  (Doc. No. 41-4 at ¶ 47.)  This is supported by testimony during the administrative hearing; for example, J.O.'s mother testified regarding the second interim IEP issued on September 17, 2018 and the pending IEEs:

> Q: And based on everything you knew at that point, did you believe that that [interim] IEP was—offered [J.O.] an appropriate program?
>
> A: Yes, it offered goals that we wanted to work on, but we, you know, that was an interim IEP, and we were waiting on recommendations from professionals to, really, pull it all together.

(Admin. Record, No. 13, Ex. 13, 145:6–12.)  This testimony confirms that the interim IEP period was crafted not only to meet J.O.'s interim needs, but also to afford "more time" for the District to formulate a final IEP after receiving the three IEEs that would meet J.O.'s final needs in accordance with the IDEA.  Finally, the parties agreed, generally, to the content of the interim IEPs in the Settlement Agreement, and the District was bound by this Agreement.

The decision of the Hearing Officer that J.O.'s right to a FAPE was being delayed until the IEEs were completed does not conflict with the provision in the 2018 Settlement that nothing in it would be acknowledged to "constitute part of a [FAPE] for the student."  (Doc. No. 13-40 at 43.) Rather, under Ballard, the Court also reads the Settlement Agreement as waiving J.O.'s right to a

FAPE until the IEEs were completed.  Contrary to what Plaintiffs argue, the Agreement did not create an obligation in addition to what the IDEA requires.  Instead, the Settlement allowed the District a reasonable time to create an IEP that would provide J.O. a FAPE.  Additionally, while Parents contend that the interim IEPs fall under the reservation of rights for "events that occur after the date" of the Agreement, the interim IEP period is expressly contemplated by the Agreement.[19] (See Doc. No. 41-2 at 15.)  The 2018 Settlement was valid and binding, and Parents cannot void the terms of the agreement because they now believe they settled for less than what the IDEA requires.  Finally, the Hearing Officer's decision regarding the Settlement was within his jurisdiction, as he did not impermissibly enforce any of the terms of the Agreement and merely found that a valid agreement existed.  Therefore, the 2018 Settlement Agreement controlled the District's obligations to J.O. from August 9, 2018 to December 3, 2018.

### 2.    FAPE Was Not Denied from August 9, 2018 to December 3, 2018

Although the Settlement Agreement set the District's obligations to J.O. for the described period, Parents may still be entitled to relief for denial of a FAPE if they can show that the District failed to abide by the Agreement.  See H.E. v. Walter D. Palmer Leadership Learning Partners Charter Sch., 220 F. Supp. 3d 574 (E.D. Pa. 2016) (the existence of a settlement agreement is not dispositive of IDEA claims).  By reserving their rights under the Settlement, the Hearing Officer correctly noted that "Parents are entitled to a claim that a breach constitutes a denial of FAPE." (Doc. No. 3-1 at 23).  However, Plaintiffs have not demonstrated that Defendant breached the Settlement Agreement and therefore have failed to show that the District denied J.O. a FAPE during the first part of J.O.'s 2018–2019 school year at Vare-Washington.

---

[19]  The Hearing Officer noted that "[t]he Parents' reservation [of rights], however, cannot be construed as nullification of portions of the Settlement that direct the parties' actions after its execution."  (Doc. No. 3-1 at 23.)

Instead, the administrative record shows that the District kept the promises it made to the Parents in the 2018 Settlement Agreement.  First, the District issued an interim IEP on August 16, 2018, a week after the Agreement was adopted, which was within the proscribed 15-day period. (Doc. No. 13-1 at 5.)  Second, the Hearing Officer correctly found that the two interim IEPs the District issued met the substantive requirements and goals set forth in the Settlement Agreement. (Id. at 6; Admin. Record, No. 13, Ex. 13 at 144–45, 97, 172–73; Ex. 9, 956–57.)  Third, when Plaintiffs had revisions and concerns about any of the items contained in the interim IEP, the District diligently addressed them within a reasonable time and manner.  (Admin. Record, No. 13, Ex. 14, S-4; Ex. 12 at 164–68; Ex. 9 at 953–55; Ex. 14, S-4, S-5; Ex. 14, S-7 at 276–78, 294–99, 307; Ex. 13 at 141–42, 164, 168–69; Ex. 12 at 98:23–99:8.).  Fourth, the District completed the IEEs it agreed to fund in the Settlement.  (Admin. Record, No. 13, Ex. 14, S-20.)  And finally, there is no evidence to suggest that the District failed to faithfully implement the interim IEPs from the start of J.O.'s first grade year on August 27, 2018 until December 3, 2018, when the IEEs were completed and a final IEP could be drafted and implemented.

Importantly, Plaintiffs' chief issues with J.O.'s education seem to stem from two schooling decisions expressly contemplated by the Settlement: (1) his placement in a general education classroom and; (2) his placement with a one-on-one aide who would be supervised by a Board Certified Behavior Analyst ("BCBA").  (See Doc. No. 41-2 at 19, 31.)  Parents argue that "[t]o make progress in school, J.O. needed a very small classroom with frequent individualized attention," as opposed to Ms. Buse's general education classroom.  And Brianna Lomax, J.O.'s aide, had "no certifications or relevant training" and for this reason was not qualified to meet J.O.'s needs.  (See id. at 19, 31.)

However, in the Settlement Agreement, Plaintiffs agreed that J.O. would be placed in the general education setting and removed from the small autistic support classroom where he had spent his kindergarten year.  (See Doc. No. 13-40 at 42.)  Also, the main evidence that Parents rely on to show the alleged insufficiency of Ms. Buse's classroom is the testimony of Jessica Dean, a Board-Certified Behavior Analyst ("BCBA") who was hand-selected by Plaintiffs and "only had one observation" of J.O.  (Admin. Record, No. 13, Ex. 10 at 554.)  Additionally, the Agreement is silent on the credentials of the one-on-one aide.  Rather, it provides that a District BCBA would train the aide to assist J.O. and monitor his behaviors.  (See id.)  The District abided by this term. Jamie Devlin, the District's BCBA, conducted competency checks and trained Ms. Lomax in accordance with the Agreement.  (Admin. Record, No. 13, Ex. 11 at 515–24.)  Further, a second District BCBA, Jennifer Cronin, provided training to Ms. Lomax and Christine Ryan, J.O.'s special education teacher.  (Id. at 523–24.)

Giving due weight to the Hearing Officer's findings under the modified de novo standard, the District did not violate the IDEA during this period.  Because the record shows that the District met its obligations to Plaintiffs under the Settlement Agreement, the District did not deny J.O. a FAPE during this period.

### C.  The Hearing Officer Correctly Found J.O Was Provided with a FAPE from December 3, 2018 to March 22, 2019

The next period the Court will consider for purposes of Plaintiffs' IDEA claims is the period from December 3, 2018 until March 22, 2019, or the period from when the IEEs were completed until the District set in place J.O.'s final IEP.  During this period, J.O. was taught in accordance with the last interim IEP, executed on September 18, 2018.  And during this time, the District's IEP team met with Parents several times from January to March of 2019 to create J.O.'s final IEP.

For this period, as well, Plaintiffs have failed to show that the Hearing Officer erred in finding against them on their IDEA claim.

For the schooling from December 3, 2018 to March 22, 2019, Parents state their concern with the Hearing Officer's decision as follows:

> From December 3, 2018 through March 22, 2019, the Hearing Officer acknowledged that J.O.'s IEPs "must be judged against IDEA standards" but then found that those standards were completely controlled by the 2018 Settlement, and whether the District "did what it promised to do" in that agreement and the ensuing IEPs. Ignoring Parents' arguments that the IEPs were substantively flawed, the Hearing Officer addressed only whether the District had created the IEPs using appropriate procedures and then implemented them; he did not assess whether they were sufficient to provide a FAPE.

(Doc. No. 41-2 at 12.)  Overall, Parents allege that, for this period of schooling, the Hearing Officer failed to evaluate J.O.'s interim IEP and its implementation under the FAPE standard and instead held that the Settlement Agreement bound the District during this time period, too.  (Id.)  However, this is not true.  To the contrary, for this period, the Hearing Officer held:

> IEPs drafted after December 3, 2018, must be judged against IDEA standards, not the standards set by the Settlement.  The chronology of events, however, significantly impacts upon the District's obligations.  After December 3, 2018, the District did what it promised to do: it reconvened the Student's IEP to consider the IEEs and revise the IEP.  The record does not reveal why the District scheduled the IEP team meeting to convene a full month after it received the IEEs but, given the time of year and the considerable work that the District was required to do simply to prepare for the meeting, I find that it was reasonable for the District to convene the IEP team on January 3, 2019.
>
> Despite concerns about the independent FBA, the District accepted several of the independent evaluator's findings and proposed its own evaluations.  The IEP team did not finish reviewing the IEEs and drafting the IEP on January 3, 2019, and so the team was scheduled to reconvene on January 31, 2019 to complete its work.  In the interim, with the Parents' consent, the District changed the Student's classroom and proposed its own evaluations (as recommended in the independent FBA).

(Doc. No. 3-1 at 26.)   Explaining the time gap between when the IEEs were completed on December 3, 2018 and when a final IEP was put in place for J.O. on March 22, 2019, the Hearing Officer explained:

> The record concerning how the IEP team reconvened is problematic for both parties.  The parties were in constant communication, and so it is striking that the Parents did not tell the District that they would bring an advocate to the January 31, 2019[] meeting.  It is equally striking that the District did not bring personnel to the meeting who could proceed with an advocate, given the history between the parties.  Ultimately, the meeting did not reconvene on January 31, 2019.  Instead, the IEP team reconvened on February 14, 2019, and concluded their work.  This resulted in the proposed IEP of February 21, 2019.
>
> The Parents did not approve the February 21, 2019 IEP.  Instead, they continued to negotiate IEP terms with the District.  For all practical purposes, both parties acted like the IEP team meeting that started on January 3, 2019[] was still ongoing.  The Student's education remained controlled by an interim IEP that was drafted before the parties had the IEEs.  This stasis remained in place through March 22, 2019, when the Parents provided consent for the District to implement the March 14, 2019 IEP without agreeing to its appropriateness.

(Id. at 27) (footnotes omitted).  With this in mind, the Hearing Officer reasoned:

> Even though the District was obligated to implement an interim IEP from December 3, 2018 through March 22, 2019, the Parents still argue that the Student is entitled to compensatory education during this period of time.  As with the prior period, they claim that the District did not implement the interim IEP with fidelity, resulting in a denial of FAPE.  As with the prior period, the District's obligation to implement the interim IEP is not a defence [sic] against an implementation failure claim.
>
> There is some question as to whether IEP implementation for the period from December 3, 2018, through March 22, 2019 is judged against the Settlement or the IDEA.  My conclusion is the same under either standard.

(Id. at 28.)  Pursuant to this remark, the Hearing Officer concluded:

> For the period of time from December 3, 2018 through March 22, 2019, I find that the Parents did not prove by preponderant evidence that the District failed to implement the Student's last-approved interim IEP (which the District was obligated to implement).  The Student is not owed compensatory education for this period of time.

(Id. at 31.)

The Hearing Officer was correct in finding that this period presented a dichotomy.  On the one hand, the existence of and general contents in the interim IEP were determined by the Settlement Agreement, and the District had a duty to implement the interim IEP while it formulated J.O.'s final IEP.   As explained above, the Settlement Agreement would not make sense if the parties intended for the interim IEPs, which lacked the data and results from the IEEs, to be fully compliant with the IDEA.  On the other hand, because the Settlement Agreement only controlled the parties' obligations until the point at which the IEEs were completed, or December 3, 2018, the Court must assess this period under the IDEA.

Because the interim IEP used during this period was set on September 18, 2018, before the IEEs were completed on December 3, 2018, it would not have been appropriate for the Hearing Officer to have assessed its contents under the FAPE standard.  Nevertheless, if the District did not teach J.O. pursuant to the interim IEP during this period, the failure to implement the IEP would give rise to an IDEA violation in itself, which the Hearing Officer acknowledged and addressed. As the Third Circuit held in <u>Melissa S. v. Sch. Dist. of Pittsburgh</u>, 183 F. App'x 184 (3d Cir. 2006):

> To prevail on a claim that a school district failed to implement an IEP, a plaintiff must show that the school failed to implement substantial or significant provisions of the IEP, as opposed to a mere <u>de</u> <u>minimis</u> failure, such that the disabled child was denied a meaningful educational benefit.   Flexibility to implement an IEP is maintained, yet the school district is accountable for conferring some educational benefit upon the handicapped child, as required by the IDEA.

<u>Id.</u> at 187 (internal citations and quotation marks omitted).   In <u>Melissa S.</u>, the Third Circuit affirmed a district court's grant of summary judgment in favor of the school district, finding that the school district did not fail to implement the student's IEP, in violation of the IDEA, agreeing "that a reasonable jury could not conclude that appellees failed to implement [Student]'s IEP because there was no evidence of non-implementation." <u>Id.</u>

The Court finds similarly here. Based on the record, during the due process hearing, Parents challenged proper implementation of the interim IEP in two ways: first, that the data concerning J.O.'s behavior was "nonsensical and unreliable;" and second, that the methods used by the District to implement the interim IEP were inefficient. (See Admin. Record, No. 13, Ex. 4 at 23.) This is precisely what the Hearing Officer evaluated in his decision for this time period, addressing Parents' allegations regarding implementation failure and noting that he was "struck by the overwhelming lack of conflict in the District's data," in addition to finding that the District used sufficient methods to implement the interim IEP from December 3, 2018 to March 22, 2019. (Id. at 34.) His analysis and conclusions comported with the above standard, noting:

> [T]o establish an IEP implementation failure, the Parents must show that the services promised in the IEP were not delivered. There is no preponderant evidence that services offered in the Student's IEP from December 3, 2018 through March 22, 2019 were not delivered.

(Id. at 36.) Therefore, the Hearing Officer did, in fact, evaluate this period pursuant to what the IDEA requires. Further, he did not err by only deciding whether the District committed an implementation failure under the IDEA for this period, rather than conducting a substantive analysis of the interim IEP, which is what Plaintiffs challenge in their Motion.

Giving due weight to the Hearing Officer's findings of fact, the Court concludes that the District did not violate the IDEA during this period. Upon review of the record, the Court reaches the same conclusion as the Hearing Officer. After assessing whether the District implemented J.O.'s interim IEP with fidelity and according to its terms for the period from December 3, 2018 to March 22, 2019, the Court concludes that Parents have not demonstrated an implementation failure during this time under the IDEA. The record demonstrates that, pursuant to the last-revised interim IEP, the District placed J.O. in a regular education classroom with a teacher preferred by Parents on January 7, 2019, provided J.O. with continued one-on-one support, gave J.O. speech

38

and language therapy, and administered occupational therapy to J.O. during the December 3, 2018 to March 22, 2019 period.  (See Admin. Record, No. 13, Ex. 14, S-7.)

Additionally, the District's data during this time was thoroughly recorded, and under the standard set forth in Melissa S., the methods used by the District to accomplish the goals in the interim IEP were appropriate to provide J.O. "a meaningful educational benefit."  For example, Ms. Turner implemented "Saxon Phonics," a research-based reading program, to J.O. to accomplish the reading goals in his interim IEP, in addition to the support J.O. received from Ms. Ryan and Ms. Lomax, his special education teacher and his one-on-one aide.  (Admin. Record, No. 13, Ex. 10 at 635, 799.)  Further, Edward Tierney, J.O.'s speech therapist, who is a certified teacher for the speech and language impaired by the Pennsylvania Department of Education, provided speech therapy in accordance with the interim IEP in both a group and individual settings. (See Doc. Nos. 42-2 at 39, 43-1 at 69–70.)  Finally, pursuant to the interim IEP, J.O. was provided with 180 minutes per month of occupational therapy.  (See Doc. Nos. 42-2 at 41–42, 43-1 at 74–75.)  Based on this evidence and a lack of significant evidence to the contrary, Parents are unable to show that "the school failed to implement substantial or significant provisions of the IEP," as is required to establish an implementation failure under the IDEA.  See Melissa S., 183 F. App'x at 187.  Therefore, Parent's IDEA claim is denied for this period.

**D.  The Hearing Officer Correctly Found J.O Was Provided with a FAPE from March 22, 2019 to May 7, 2019**

The third and final time period the Court will evaluate is from March 22, 2019, or when the District began to implement J.O.'s final IEP, until May 7, 2019, when Parents disenrolled J.O. from the District.  For this time period, Parents state their concerns with the Hearing Officer's decision as follows:

From March 22, 2019 through May 7, 2019, the Decision found that J.O. was offered a FAPE because the March 2019 IEP "was based on the most current, thorough evaluations" of J.O.—the same evaluations that were conducted under the 2018 Settlement—and because Parents had not shown the District's failure to implement the March 2019 IEP.  But the Hearing Officer failed to address Parents' arguments that the March 2019 IEP was substantively inappropriate.

(Doc. No. 41-2 at 12–13.)  Yet, for this time period, the Hearing Officer found:

The District's March 14, 2019, IEP was reasonably calculated to provide a FAPE when it was offered because, from its inception, it was based on the most current, thorough evaluations of the Student available at the time the document was drafted. The IEP that was in place from March 22, 2019 through May 7, 2019, was appropriate.  The Parents have not proven by preponderant evidence that the District failed to implement that IEP for the same reasons as stated above. Consequently, the Student is not entitled to compensatory education for this period of time.

(Doc. No. 3-1 at 32.)

Under the IDEA, an eligible student is entitled to "an educational program reasonably calculated to enable a child to make progress in light of the child's circumstances."  Endrew F., 137 S.Ct. at 1001 (2017).  However, courts in this district have emphasized that this standard does not mean that the student is entitled to the best possible program or one that the parents would like to see ideally implemented.  In Coleman v. Pottstown School District, the court emphasized:

The FAPE promised to students in the IDEA is not a perfect or ideal education. The Congressional purpose of the IDEA was to open the door of public education to handicapped children on appropriate terms more than it was intended to guarantee any particular level of education once inside.

983 F. Supp. 2d 543, 563 (E.D. Pa. 2013), aff'd in part, 581 F. App'x 141 (3d Cir. 2014) (citing Rowley, 458 U.S. at 192) (internal quotation marks omitted); see also K.C., 806 F.Supp.2d at 813 (holding FAPE is not a guarantee of the "best possible" or maximal education).  As noted earlier, a court assesses the FAPE standard by the child's IEP, evaluating whether the IEP was "reasonably calculated to enable the child to receive educational benefits."  See K.C., 806 F.Supp.2d at 813.

The evidence demonstrates that the District complied with the IDEA by issuing IEPs that were reasonably calculated to provide J.O. a FAPE.  The final IEPs issued during the period from March 22, 2019 to May 7, 2019, the March 14, 2019 IEP, which was implemented starting March 22, 2019, and the April 25, 2019 IEP,[20] were based on numerous evaluations and observations from the District's BCBAs, as well as Plaintiffs' own independent evaluators.  (Admin. Record, No. 13, Ex. 13 at 166–68.)   The IEPs contained J.O.'s present levels of academic achievement and functional performance, a statement of measurable annual goals, how the child's progress toward meeting the annual goals is to be measured, and provided for special education and supplementary aids and services.  See § 1414(d)(1)(A)(i).  Importantly, the evidence shows that the March 14, 2019 IEP was not just good on paper, but actually helped J.O. achieve learning and behavioral goals.  For example, J.O.'s special education teacher, Ms. Ryan, testified that "[J.O.] has made dramatic academic[], social[,] and behavior[al] progress throughout the school year," and that she "noticed an increase in academic participation in the regular education classroom."  (Admin. Record, No. 13, Ex. 12 at 120–21.)

Plaintiffs disagree with this assessment.  At the hearing held on June 11, 2021, they asked the Court to focus on three major areas of J.O.'s instruction: reading, behavior management, and occupational therapy.  (See Doc. No. 41-2 at 21, 28, 32.)   For reading, Plaintiffs assert that J.O. ended his first-grade year at no greater than a kindergarten reading level, as he was stuck at Level B on the DRA2.[21]  (Id. at 21.)  However, this claim is contradicted by the testimony of Ms. Ryan and Ms. Turner, J.O.'s teacher for the second half of the 2018–2019 school year.  In Ms. Ryan's

---

[20]  This IEP was never implemented, as the parents disenrolled J.O. from the District before approving it.  (Admin. Record, No. 13, Ex. 15, P-88.)

[21]  DRA2 is "a developmental reading assessment that helps teachers assess a student's independent reading level."  (Doc. No. 42-2 ¶ 137.)

testimony, she said that "[J.O.] loved reading." (Admin. Record, No. 13, Ex. 12 at 71:6.) In Ms. Turner's testimony, she explained that J.O. was doing guided reading in a group setting, and that his last instructional level on the relevant reading scale was two levels higher, Level D, as he had achieved independent Level C. (Admin. Record, No. 13, Ex. 10 at 806–07.) This is corroborated by the reading evaluation conducted in April 2019. (Admin. Record, No. 13, Ex. 14 at S-62.) Taken together, this evidence and a lack of sufficient evidence to the contrary show that Parents have failed to demonstrate that J.O. was denied a FAPE in reading.

Second, regarding behavior, the District conducted its own Functional Behavior Assessment ("FBA"), in addition to the independent FBA that was done, to create J.O.'s IEP. The essence of Parents' allegations regarding their son's problem behavior is that it became worse while he was at Vare-Washington. (See Doc. No. 41-2 at 32.) To the contrary, the record demonstrates that J.O.'s behavioral deficiencies improved while he was enrolled there. Although Parents point to J.O.'s placement in a regular education classroom as giving rise to some behavioral issues, the results of J.O.'s VB-MAPP, an assessment that measures the school readiness of young children, supported his continued placement in a regular education classroom. (See Doc. No. 3-1 at 7.) Ms. Turner, who taught J.O. from January 7, 2019 until May 7, 2019 testified that J.O.'s problem behavior improved during his time in her classroom:

> A: Problem behaviors would be when he didn't want to do the work. Like I said, he would hold his body really tight, refuse to say he doesn't want to do it. And it took a lot of encouragement for him.
>
> Q: Did he—were there any other problem behaviors?
>
> A: No.
>
> Q: How did that change from January to April?
>
> A: He was more willing to give things a try towards the end.

Q:  And did he still engage in that clenching behavior and refusal behavior?

A:  No, not as much. I mean, there were times when he didn't—if it's something that he doesn't like to do. But he got a lot better with it. You know, and by that time, I was able to talk to him. And he would open up more and listen and try it.

Q:  Can you explain [the] change over time in your relationship with [J.O.]?

A:  One of the changes—what I like was his social skills became a lot better because he became a better listener when you're asking him to do something. Before, he just would resist.

(Admin. Record, No. 13, Ex. 10 at 822:3–20.)  During this time, J.O. was able to work better with other students in the class and his social skills with his peers improved.  (Id. at 822–23.)  This was an improvement from behaviors J.O. exhibited at the beginning of the year, such as aggression and escaping learning tasks.  (Admin. Record, No. 13, Ex. 10 at 561, 569–70.)  Lastly, the record reflects that it would be unrealistic for Parents to have expected the entirety of J.O.'s problem behavior to subside during his time at Vare-Washington.  Dr. Felicia Hurewitz, a cognitive behavior scientist who observed J.O., testified that she believed it would "take a very long time for his conditioned response when certain demands are made to go down, a very long time" based on his level of anxiety.  (Admin. Record, No. 13, Ex. 6 at 1629:20–21.)  Therefore, while the District was unable to completely eliminate the behaviors targeted in J.O.'s IEPs, the fact that J.O. occasionally would still exhibit behavioral deficiencies, by itself, does not rise to the level of denying him a FAPE.  Thus, Plaintiffs have failed to show that the District denied J.O. a FAPE in the behavioral aspect of his education.

Third, Plaintiffs have not succeeded in demonstrating that the District denied J.O. a FAPE due to a lack of occupational therapy ("OT").  Although Parents argue that their son was to receive "120 minutes per week (480 minutes per month) of 'direct, individual' OT," this timeframe was a recommendation from an independent evaluator.  (Doc. No. 41-2 at 34.)  It was considered by the

43

District's occupational therapist when developing J.O.'s OT plan, which was to provide J.O. 45 minutes per week of individual OT and 30 minutes per week of collaborative OT.  (Admin. Record, No. 13, Ex. 14, S-31.)   The District was not bound by the independent evaluator's recommendations, and not following the evaluator's OT regimen does not amount to denial of a FAPE.  Further, while Parents allege that J.O. was denied OT opportunities beyond handwriting, the record does not support this argument either.  (See Doc. No. 41-2 at 34.)  To the contrary, J.O.'s IEPs included OT that addressed his sensory issues and motor skills, in addition to handwriting. (Admin. Record, No. 13, Ex. 14, S-7, S-31.)  Accordingly, Parents have not shown that the District denied meaningful OT services to J.O. that would allow him to gain educational benefit from his time at Vare-Washington.

Finally, based on the evidence described above, Parents have failed to show that J.O.'s IEP during this period was not properly implemented.  Consequentially, giving due weight to the Hearing Officer's findings of fact, in all contested areas of J.O.'s education, Plaintiffs have failed to demonstrate that J.O. was denied a FAPE under the IDEA under the modified de novo standard of review.

### E.     Section 504 and ADA Claims

Section 504 and ADA claims are both adjudged under the same standard.  The Third Circuit has held:

> Because the same standards govern both the [] RA and ADA claims, we may address both claims in the same breath.  To prevail on a violation of either of those statutes, the [claimant must] to demonstrate that [Child] (1) has a disability; (2) was otherwise qualified to participate in a school program; and (3) was denied the benefits of the program or was otherwise subject to discrimination because of her disability.

Chambers ex rel. Chambers v. Sch. Dist. Of Philadelphia Bd Of Educ., 587 F.3d 176, 189 (3d Cir. 2009) (internal citations omitted).  Additionally, in most circumstances, establishing the denial of a FAPE suffices to establish a § 504 claim.  M.D., No. CV 20-2354, 2021 WL 1924083, at *12.

Applying this three-part test, the parties do not dispute that J.O. has a disability and is otherwise qualified to participate in a school program, thus meeting the first two parts of this analysis.  However, Parents have not succeeded in showing that J.O. was subject to discrimination at Vare-Washington Academy because of his disability.  The facts described previously and the Court's review of the record show there is insufficient evidence that the District discriminated against J.O. because of his disabilities.  Rather, the multiple evaluations and observations, OT, and support services, provided to J.O. by Ms. Lomax and Ms. Ryan among others, allowed him to be in a general education classroom with his peers and gain "meaningful participation in educational activities and meaningful access to educational benefits."  See M.R., 680 F.3d at 280.  Consequently, the Parents' contention that Section 504 and the ADA were violated is unavailing.

### F.   Summary Judgment as to Counts I and II of the Complaint

#### 1.   Compensatory Education

In Count I of the Complaint, Plaintiffs seek compensatory education under the IDEA, Section 504, and the ADA.  As noted above, compensatory education is an equitable remedy in which a child is given additional education hours to make up for deficient hours of schooling where they were not provided a FAPE.  See Ferren C., 612 F.3d at 717.  "A court award of compensatory education requires a school district to provide education past a child's twenty-first birthday to make up for any earlier deprivation."  M.C., 81 F.3d at 395.  The standards for compensatory education for denial of a FAPE are identical under the IDEA, Section 504, the ADA. See, e.g., Neena S., 2008 U.S. Dist. LEXIS 102841, at *44–47.

As detailed <u>supra</u>, Plaintiffs have failed to demonstrate that J.O. was denied a FAPE during the 2018–2019 school year at Vare-Washington.  And while Parents offer the additional argument that the Hearing Officer failed to address the District's offer of "25 compensatory education hours for loss of Occupational Therapy" due to a staffing issue during a short period in January 2019 (Doc. No. 41-2),  this offer was part of the NOREP extended to Parents on April 25, 2019, which they never accepted, deciding instead to enroll J.O. at a private school less than two weeks later. (Admin. Record, No. 13, Ex. 15, P-88.)  For these reasons, the Court will not award compensatory education to Plaintiffs as an equitable remedy, will deny Plaintiffs' Cross-Motion for Summary Judgment, and will grant Defendant's Cross-Motion for Summary Judgment on Count I.

## 2. Tuition Reimbursement

In Count II of the Complaint, Plaintiffs seek tuition reimbursement for J.O.'s education at Orchard Friends, a private school.  Courts in the Third Circuit employ the <u>Burlington-Carter</u> test to determine whether parents are entitled to reimbursement for their child's education in a private school.  <u>See</u> <u>Sch. Comm. of Burlington v. Dep't of Educ.</u>, 471 U.S. 359 (1985); <u>Florence Cty. Sch. Dist. Four v. Carter ex rel. Carter</u>, 510 U.S. 7 (1993).  Under the test, Plaintiffs must demonstrate that: (1) the public school did not provide their child a FAPE; (2) placement in the private school instead of the public school was proper; and (3) the equities weigh in favor of reimbursement. <u>M.D.</u>, No. CV 20-2354, 2021 WL 1924083, at *4 (citing <u>Burlington-Carter </u>test).  All three factors must be met for Parents to be awarded tuition reimbursement under the IDEA.  And as noted in <u>M.D.</u>:

> Typically, tuition reimbursement is awarded as of the date that parents notify the school of their dissatisfaction, such as when they reject an IEP and enroll their child in a private school. This is the unusual context where the child was already attending a private school when the district denied [her] a FAPE.  In this situation, courts have calculated tuition from the point at which the school <u>should</u> have acted [.]

Id. at *11 (emphasis in original).  Here, Parents gave their 10-Day Notice of withdrawal to the District by email on April 22, 2019.  (Doc. No. 3-1 at 12.)  This is the point at which the District "should have acted."  And it did.  Immediately after Plaintiffs notified the District of their intent to enroll J.O. at a private school, the District issued another IEP for J.O. that was a revision of the March 14, 2019 IEP and was based on updated evaluations and data, as well as the removal of a goal that the District determined J.O. had mastered.  (Admin Record, No. 13, Ex. 15, P-60, Ex 14, S-57.)

The April 25, 2019 IEP addressed a multitude of goals related to J.O.'s behavior, social skills, language skills, writing, reading, mathematics, overstimulation, refusal behaviors, and transitions.  (See Admin. Record, No. 13, Ex. 15, P-62.)  Regarding Parents' concerns that J.O. was not performing at grade level, the District reviewed the goals in the IEP to ensure they met Common Core Standards.  (Admin. Record, No. 13, Ex. 12 at 120, 197–208.)  Taken together, this evidence shows that the Hearing Officer correctly decided that the April 25, 2019 IEP was reasonably calculated to provide J.O. a FAPE.  Thus, Plaintiffs have not demonstrated that the District did not provide their child a FAPE, the first part of the Burlington-Carter test.

To support the second factor, which asks whether placement in the private school was proper, Parents proffer in their Motion that Orchard Friends is an "appropriate school for J.O.," while the District argues that Parents placement at Orchard Friends was "wholly inappropriate." (Doc. No. 42-1 at 18.)  A private placement is appropriate if "it provides significant learning and confers meaningful benefit."  Mary Courtney T. v. Sch. Dist., 575 F.3d 235, 242 (3d Cir. 2009). The record demonstrates that Orchard Friends provides J.O. with a meaningful benefit; however, because the Parents have not met the first part of the Burlington-Carter test, this does not change the outcome of the Court's analysis.

Third, for the equities to favor reimbursement, a court must determine that the first two factors of the Burlington-Carter test are met, at which point the court considers "all relevant factors, including the notice provided by the parents and the school district's opportunities for evaluating the child." Forest Grove Sch. Dist., 557 U.S. at 247. Yet, because the first step was not met by Parents, the equities do not weigh in favor of tuition reimbursement.

Finally, as noted above, it is unclear whether Plaintiffs must additionally prove intentional discrimination to receive tuition reimbursement under Section 504 and the ADA. Compare Lauren G., 906 F. Supp. 2d at 390–91 with Kirsch, 722 F. App'x at 228 (not precedential) (holding parents must prove "deliberate indifference" to obtain tuition reimbursement under Section 504 and the ADA). Nevertheless, Plaintiffs have failed to show intentional discrimination against J.O. by the District. Even applying the less-burdensome standard, where Plaintiffs need not show deliberate indifference and the standard is the same as under the IDEA, Parents are not entitled to tuition reimbursement. And for the same reasons, they also are not entitled to tuition reimbursement under Section 504 and the ADA.[22]

### G.    ESY Reimbursement

The Hearing Officer's grant of Extended School Year ("ESY") services reimbursement to Plaintiffs will be affirmed, and Defendant's crossclaim in their Cross-Motion for Summary Judgment will be denied. As mentioned above, on March 8, 2019, the District extended a NOREP to Parents that recommended J.O. attend "a two-week program at a private therapeutic center that [J.O.] had previously attended, and a six-week autistic support program housed in a learning support classroom during the summer of 2019." (Doc. No. 3-1 at 10.) After Parents requested a

---

[22]  Count III of the Complaint seeks attorney's fees and costs under the IDEA, Section 504, and the ADA.

meeting to discuss the ESY further, the District and Parents agreed to revise the ESY plan so that

J.O. would attend a private camp for disabled children, instead of the six-week autistic support

program.  (Id. at 11.)  The District committed to funding J.O.'s time at camp and providing forty

(40) hours of compensatory education for his services at the therapeutic center over the summer.

(Id.)  While Parents sought more compensatory education from the District, they accepted its offer

to fund the summer camp.  (Id. at 12.)

In his only conclusion in favor of Plaintiffs, the Hearing Officer awarded Plaintiffs

reimbursement for J.O.'s ESY summer program in 2019.  In its Motion, Defendant seeks to

reverse this determination because "the District had no obligation to honor the NOREP that it had

offered Plaintiffs in March 2019" because the Plaintiffs voluntarily disenrolled their son from

Vare-Washington prior to the summer, when ESY programming was to take place.  (Doc. No. 42-

1 at 29–31.)

Analyzing this issue, the Hearing Officer found "there is preponderant evidence that the

District offered to pay for the camp that the Student attended and 40 additional hours of

compensatory education," adding that "[t]hose 40 hours were intended to offset the cost of services

from the therapeutic center."  (Doc. No. 3-1 at 33–34.)  He continued:

> The fact that the District made this offer despite its own belief that it could provide
> an appropriate ESY program itself is irrelevant.  The District made its ESY offer
> through a NOREP.  The Parents accepted that NOREP, and so the District is bound
> by it.
>
> There is no preponderant evidence that the Student required more services than
> what the District offered through the ESY NOREP.  The Parents are entitled to
> reimbursement for the camp that the Student attended in the summer of 2019 and
> 40 hours of compensatory education to offset the cost of service from the
> therapeutic center.

(Id. at 34.)

49

After review of relevant authority and the parties' briefings, the Court will affirm the Hearing Officer's grant of ESY reimbursement to Parents.  Aside from the fact that Plaintiffs accepted the District's offer of reimbursement for J.O.'s summer camp, the District has already paid this amount to Parents in full for the services they obtained for J.O. during the summer of 2019.  (See Doc. No. 41-4 at 22.)  Accordingly, the Court will deny Defendant's Motion in part with respect to their counterclaim against the District for these funds.

IV.    **CONCLUSION**

For the foregoing reasons, Plaintiffs' Cross-Motion for Summary Judgment [on the Administrative Record] (Doc. No. 41) will be denied, and Defendant's Cross-Motion for Summary Judgment on the Administrative Record (Doc. No. 42) will be granted as to Counts I and II of the Complaint, but denied as to Defendant's counterclaim for ESY reimbursement.  In doing so, the Hearing Officer's decision will be affirmed in full.  An appropriate Order follows.